DAYLE ELIESON
United States Attorney
STEVEN W. MYHRE
NADIA J. AHMED
DANIEL R. SCHIESS
Assistant United States Attorneys
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
steven.myhre@usdoj.gov
nadia.ahmed@usdoj.gov
dan.schiess@usdoj.gov

*Representing the United States*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>        v.<br><br>TODD C. ENGEL,<br><br>             Defendant. | 2:16-CR-00046-GMN-PAL<br><br>**GOVERNMENT'S     SENTENCING MEMORANDUM** |

**CERTIFICATION**:   The undersigned certify that this pleading is timely filed.

Pursuant to LCR 32-1(d), the United States, by and through the undersigned, respectfully submits its Sentencing Memorandum in connection with defendant Todd C. Engel (hereinafter "defendant Engel" or "Engel").

## I.     Summary of Argument

Engel's conduct on April 12, 2014, was violent, serious, and deadly and his sentence should reflect that simple fact. The government respectfully submits that defendant Engel should be sentenced to a term of imprisonment consistent with the Sentencing Guidelines recommendation of at least 210 months, as outlined by the

United States Probation Office in its Pre-Sentence Investigation Report ("PSR") (revised on September 16, 2017), and further impose an upward adjustment pursuant to USSG § 3A 1.4 (n. 4), consistent with the Court's application of this provision as to other defendants in this case. The Court should further enter an order of restitution for the value of the property obtained through extortion and impose a term of supervised release. This sentence is supported by each of the factors provided in Title 18, United States Code, Section 3553(a).

## II.    Procedural Background

On March 2, 2016, a grand jury in this district returned a superseding criminal indictment against defendant Engel and eighteen others in relation to the criminal events that occurred between April 6 and 12, 2014. On March 3, 2016, Engel was arrested in Idaho pursuant to that indictment and detained pending trial.

On February 6, 2017, jury trial commenced against Engel and five other co-defendants. Engel represented himself at trial with standby counsel present to assist him. Engel nearly caused a mistrial midway through the trial, intentionally raising the issue of an unavailable witness (Dan Love) before the jury, despite repeated admonitions by the Court against doing so. Thereafter, Engel's pro se status was temporarily revoked. However, the Court reinstated his status and allowed him to deliver his closing argument to the jury.

The trial evidence showed Engel brandishing his assault rifle at law enforcement officers standing in the open well beneath his position perched behind concrete barriers on the I-15 overpass, his contemporaneous statements indicating

that he was prepared to shoot the officers because they were enforcing court orders, and his subsequent social media postings glorifying all of it.

Following deliberations and on April 24, 2017, the jury convicted Engel of two counts in the Superseding Indictment: Obstruction of Justice (Count 12) and Interstate Travel in Aid of Extortion (Count 16), the jury being unable to reach a unanimous verdict on the remaining counts against him. The Court entered the guilty verdicts as to the two counts and declared a mistrial on the remaining counts, setting them for retrial in July 2017.  In light of the convictions on two serious felony counts, the United States elected to dismiss the remaining counts and to thereafter proceed to sentencing on the counts of conviction.

On January 8, 2018, the Court granted motions to dismiss the Superseding Indictment against Engel's co-defendants – Cliven Bundy, Ammon Bundy, Ryan Bundy and Ryan Payne – who were alleged to have organized and led the assault against the police officers.  During their trial (referred to colloquially as Trial 3), the Court agreed with those defendants' serial motions contending that the government committed *Brady* violations by supposedly suppressing provocation evidence.  In the aftermath of the Court's dismissal, Engel filed motions for a new trial or outright dismissal of his convictions, attempting to "pony off" the Court's rulings in Trial 3.

The issues surrounding the claimed *Brady* violations in connection with the government's disclosures during Trial 3, have been extensively briefed and re-briefed by the government, both in connection with Engel's post-trial motions and in numerous other initial and responsive briefs filed in this case.  Those issues need not

be recounted here except to note that the United States steadfastly stands by its previously asserted position that none of the information disclosed during Trial 3 constitutes *Brady* information, none of it was suppressed intentionally, flagrantly, outrageously, recklessly, or otherwise, and none of the disclosures does violence to the constitution.  Further, none of this information (which relates to events occurring days, weeks, and – in many instances – years before the events of April 12) pertains at all to Engel – who did not arrive at Bundy Ranch until the morning of April 12.

Briefing on Engel's Motion to Dismiss was completed on March 6, 2018, and he remains in custody pending sentencing.  Sentencing is currently scheduled for July 19, 2018.

## III.   Points and Authorities

### A.   Facts

On April 12, 2014, Todd Engel, brandishing a loaded AR-15-style rifle, joined with over 270 Bundy supporters, well over 40 of them armed, and engaged in one of the largest armed assaults on police officers in this country's history.  He not only intentionally assaulted police officers, he extorted property that had been seized by those officers pursuant to lawful federal court orders, he obstructed the administration of justice by thwarting the execution of those court orders, and he undermined the rule of law.  The traumatic effects of Engel's conduct remain with every single one of those officers to this day – they will be haunted always by the specter of guns pointed at them by the very same U.S. citizens they were sworn to defend and protect.  Guns pointed at them because the officers were doing their duty.

4

Guns pointed at them because they wore a badge that said BLM on it.  Guns pointed at them because a local rancher was annoyed by the court orders they were attempting to enforce.

In the aftermath of these prosecutions, the impact of Engel's conduct remains with every police officer across this country who must attempt to enforce the law under a regime where force against them may be justified simply by the assaulters claiming that they do not like the way the officers are dressed, that there are too many of them, that they don't like their lawful tactics, or simply that they are under no obligation to comply with court orders.  Engel claims he is defending the freedoms afforded to the citizens of this country under the U.S. Constitution.  In truth and in fact, however, Engel and his fellow supporters flagrantly disrespected the constitution on April 12.  They became the law unto themselves by force of arms – what Engel and his fellow Bundy supporters could not achieve by the force of their intellect, they achieved by the force of their guns.  Lacking any principled or moral content to their message, they used the content of the magazines they so proudly inserted into their rifles to make their point.  Engel and his fellow supporters became judge, jury and executioner on April 12, depriving the officers in the Wash of their right to life by using force and violence.

But their *modus operandi* of using guns publically to get their way did not end on April 12.  Subsequently, Engel and Bundy publically flouted their so-called "successes" from their criminal acts and said that more of it needed to happen.  Indeed, just weeks after the events of April 12, two Las Vegas Metropolitan Police

officers – doing nothing more provoking than wearing their uniforms while eating lunch in a public restaurant – were fatally gunned down by two of Bundy's followers, the killers shrouding their victims' bodies with Gadsen flags, the same type of flags so prominently displayed on April 12 by Engel's and Bundy's supporters, the killers proclaiming that the revolution had begun.  These same killers were present at Bundy Ranch in the run-up to April 12.  These same killers interviewed Bundy family members for the supporters' blogosphere, were fed breakfast by Ammon Bundy, and conversed with Bundy family members in the run-up to April 12.

**B.   Legal Standard**

Proper sentencing procedure requires that, before imposing sentence, the district court: (1) correctly calculate the Sentencing Guidelines range; (2) treat the Guidelines as advisory; (3) consider the 18 U.S.C. § 3553(a) factors; (4) choose a sentence that is not based on clearly erroneous facts; (5) adequately explain the sentence; and, (6) not presume that the Guidelines range is reasonable.  *United States v. Carty*, 520 F.3d 984, 991-93 (9th Cir. 2008).  When the court imposes a sentence within the Guidelines range, "'it is probable that the sentence is reasonable'" because the court's application of the § 3553(a) factors accords with the Sentencing Commission's independent application of those factors in the "mine run of cases." *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).

It would constitute procedural error, however, for the court to "attach [ ] a presumption of reasonableness to the Guidelines range or weight[ ] the Guidelines

range more heavily than other § 3553(a) factors." *Carty*, 520 F.3d at 994.  The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also consider the § 3553(a) factors "in determining the appropriate sentence."  *Nelson v. United States*, 550 U.S. 350, 352 (2009).

**C. Argument.**

   **i.     The PSR's Offense Level Computation is Correct.**

   **a.     Counts 12 and 16**

The PSR correctly calculated the offense level for Counts 12 and 16, before any upward adjustments, at level 37.  The PSR further correctly notes that USSG § 3A1.4 applies in this case but did not include an upward adjustment in the Guideline calculation.

   **ii.     The Court should apply a Terrorism Adjustment Under Section 3A1.4.**

The Court should apply an upward adjustment of up to 5 levels under U.S.S.G. § 3A1.4 as to Counts 12 and 16.[1]  While § 3A1.4 applies expressly to federal crimes of terrorism enumerated under 18 U.S.C. §233(b)(g)(5), Commentary Note 4 to that section notes that "there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government conduct but the offense involved, or was intended

---

[1] USSG §2B3.2 anticipates harm to one or a few people, thus the application notes state that an upward departure may be appropriate in a case such as this, where there are numerous victims. §2B3.2 comment, n.7. Similarly, 2A6.2 comment, n.4(B) states that an upward departure may be warranted when there are multiple victims.

to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 3332b(g)(5)(B) . . . ."   This is clearly such a case.

Engel, through his own words and actions, demonstrated that his purpose in assaulting, threating, and extorting federal officials, was to coerce and intimidate the federal government.  Engel's purpose in traveling from Idaho – to come to the aid of someone he never met, over cattle in which he had no interest, and spending his own funds in the process – was to contribute to Cliven Bundy's unlawful show of force to law enforcement officers in order to thwart lawful court orders and, more to the point, to send a message that future enforcement would be met with similar shows of force.

As he acknowledged in his Facebook posts, Engel was prepared to go to war with federal law enforcement (stating in posts on Facebook that he was "oiling bolt, loading magazines!").  Phone records introduced at trial showed that Engel called Operation Mutual Aid coordinator Jerry Bruckhart before he traveled to Bunkerville and called various militia hotlines as he traveled to Bundy Ranch.  As he travelled, he continued to update his Facebook status, stating at one point, "I am ready to go to Nevada [...]. I want to plow through all of the BLM's barricades and set fire to them. Reminds me of ruby ridge and Waco."

Engel continued to update his Facebook account during the assault on April 12, leaving little doubt as to his intentions as he traveled from Cliven Bundy's staging area to the BLM impoundment site five miles away.  He wrote, "Leaving now to shut down the freeway by force of arms."  His image was captured in video

footage taken by an independent reporter, stalking down the highway with his rifle loaded, holding it in the low ready and with extra ammunition in the pockets of the tactical vest he donned.  He stood on an overpass and pointed his firearm at officers in the wash below him.

Here, he is hiding behind a jersey barrier, taking cover as he bears his rifle in the low ready and looks at the officers caught on the low ground, below:



And here he stands, pointing his weapon down toward the officers:





And he celebrated the April 12 "victory" that day, uploading a video to his Facebook account documenting his deeply hate-filled jeering toward BLM officers as they drove from the area.  He continued to celebrate his conduct for years afterwards openly and publicly, even meeting with local police to do so.  He even shared a video on social media earlier in the day before his own arrest on March 3, 2016, proclaiming that the feds were coming for the resistance.

The reason Engel celebrated his perceived victory over the federal government in such a public way was to send a message to federal officers that he and the others who assaulted, threatened, and extorted the officers on April 12, were armed and prepared to confront them again if they ever took any enforcement actions against Bundy in the future.  *See* Engel's History and Characteristics of Offense Conduct, § III.C.iii.b, *supra*.  Thus, Engel's criminal conduct was aimed to

influence and coerce *future* lawful actions by the federal government.  Applying a maximum of a five-level upward adjustment under U.S.S.G. § 3A1.4 as to Counts 12 and 16 would result in a Total Offense Level of 42 and the adjustment would be consistent with that imposed when sentencing defendants Burleson and Delemus, as well as that reflected in the plea agreement of defendant Cooper.

### iii.   A Guidelines Sentence Is Consistent with the Section 3553(a) Factors.

Section 3553(a) requires the Court to impose a sentence "sufficient but not greater than necessary to comply" with the factors articulated in subparagraph 2. 18 U.S.C. § 3553(a).  The government submits that the overall nature of the offense conduct and the characteristics of the offender, when combined with the circumstances under which the offense was committed, justify a sentence of that will result in Engel serving at least 210 months' imprisonment.

### a.   The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense.

The recommended Guideline sentence is reasonable when considering the seriousness of the conduct at issue.  Engel committed multiple crimes of violence in concert with Cliven Bundy and his followers in order to threaten and coerce federal law enforcement officers from carrying out their lawful duties.  In so doing, he showed no respect for the law, for the rule of law, for law enforcement officers, for court orders, or for the community.  He was prepared and willing to kill law enforcement officers simply because they were enforcing court orders against Bundy.

11

These officers did nothing more than provide security for civilians tasked with rounding up trespass cattle pursuant to court order.  They took the reasonable measures that law enforcement officers across this country undertake in any operation covering an area and operation of this scale.  Bundy and Engel thought the BLM used too many officers to do so, so they decided to take the law into their own hands.

These officers were sought out and provoked by Bundy and his supporters throughout the days leading to the April 12 assault.  Among other things, the Bundys went so far as to ram an ATV into a dump truck in order to bring the impoundment to a halt on April 9, threaten to shut down a business owner who freely entered into a contract with the BLM to sell trespass cattle, and put out a nationwide call for militia to come to Bundy ranch to confront the BLM.   Engel answered that call and arrived at Bundy Ranch on April 12, gathering with other supporters at staging area near Bundy's home.  When Engel arrived he did not find federal law enforcement officers anywhere in this area – indeed there was no federal law enforcement officer located within five miles of Engel or the staging area.

In fact, Engel saw nothing but the Bundys, their supporters, including the many militia members, and Sheriff Gillespie, who stood on the stage and told Bundy, Engel and hundreds of Bundy supporters and militia, that the BLM was leaving the area and the impoundment operation was over.  But Engel did not then and there turn around and go home peacefully.  Rather, when Cliven Bundy later told the crowd to get his cattle, Engel followed, and drove his truck five miles to the

BLM compound, knowing he would confront the BLM officers there.  He went to the officers – negating any claim of provocation or self-defense – took a lethally advantageous position over the officers in the wash and then threatened them with an assault rifle in his hands.

And if that was not enough, Engel continued to threaten law enforcement and glorify his lawlessness up to the time of the Superseding Indictment in this case.  Like Bundy, Engel became a law unto himself and he was determined to use force and threats of force to enforce his view of the law.

Engel's violent conduct greatly affected the victims in this case.  During trial, the Court heard from 15 federal officers, who all testified about their fear on April 12, and many of whom testified to experiencing post-traumatic distress after the assault.   The Court also heard from five local law enforcement officials, including now Sheriff Lombardo, who similarly testified regarding their fears on April 12.  In addition, the Court has detailed victim impact statements from four federal officers describing the deep trauma they suffered as a result of the assault.  *See* PSR at ¶¶ 65, 66.

### b.   Engel's History and Characteristics.

On April 12, Engel posted on his Facebook account from his position on the I-15 bridge, stating, "BLM lost and has backed down due to overwhelming force of the people and our arms. WE WIN! Cattle being released as we speak. If they don't trouble will start."  In the days after he stayed in the Bunkerville area and did

patrol on behalf of the Bundys, ostensibly looking for BLM officers, documented as pictured below in the Las Vegas Sun on April 14, 2014:



STEVE MARCUS - Todd Engel, a volunteer from North Idaho who is supporting the Bundy family, returns to a campsite after a patrol near Bunkerville Sunday, April 13, 2014. The Bureau of Land Management halted their roundup of Bundy family cattle under an agreement reached Saturday.

Engel was also interviewed on a blog radio show on April 14, 2014, stating that when he returned to Idaho he would introduce himself to the head of the Forest Service there and let him (the head) know he (Engel) had been at Bundy Ranch and that "you're going to have that at your doorstep."

On April 20, Engel posted a lengthy description of the events of April 12, including how he went for a "guerilla war" and was searching out "enemy positions" during the standoff.

Engel eventually returned to Idaho. Once there, he sought out officers the Bonner County's Sheriff's Office, regaling them with an account of the events of

14

April 12 in which Engel featured himself as a hero.  Engel stated he had been "duty bound" to respond to Bunkerville and admitted he had been on the bridge during the Standoff "armed to the teeth" in a low-ready position.

Engel also stated that he was worried there would be consequences for his involvement in the assault and that he would fight if confronted by federal law enforcement officers. Engel asked that the Sheriff's Office "stay out of it" so no harm would come to them. Engel said that he was ready to "wage war" with the federal government, which he perceived to be illegal and unconstitutional. Finally, Engel asked the Sheriff's Office to tell him when a warrant came for his arrest so he could flee before it was served and "not cause any chaos in this place."

Engel was eager to find another opportunity to confront cops.  In April 2015, a year after the assault and extortion, a dispute arose between the BLM and miners in Grants Pass, Oregon at the Sugar Pine Mine. The miners requested outside assistance, to which various Bundy Ranch veterans responded, hoping for another Standoff with the BLM.  The BLM avoided the miners and armed occupants to prevent another Bundy Ranch.

On April 22, 2015, Engel commented regarding a posting about the Sugar Pine mine event on a Facebook page.  This Facebook page contains the below photograph of Engel and others posing in front of a bulldozer at the Sugar Pine mine near Grants Pass, Oregon. In response to the Facebook page's description of his trip to the mine, Engel responded by posting lengthy quotes from Patrick Henry, ending with "The war is inevitable and let it come! I repeat it, sir, let it come."

15



Engel also chose to get involved in the armed occupation of the Malheur National Wildlife Refuge (MNWR), which began on January 2, 2016 and ended 41 days later. On February 27, 2016, Engel posted a lengthy video of himself on Facebook in which he discussed the various failings of the federal government, referenced war with the United States Forest Service and recruited others to stand up and fight "for liberty."

On March 3, 2016, the day of his arrest, Engel posted a video on Facebook discussing the arrest of Eric Parker earlier that day. In discussing the arrests, Engel stated, "this is the night of the long knives," "they [the feds] are trying to cut the head off the resistance," and "there may be gun battles today between patriots and the feds." Engel was arrested later that day.

Although Engel has continued to provide interviews post-conviction which have been shared on YouTube and Facebook, as recently as June 2018, discussing

16

the case, discussing the failure of state officials to act against the federal government, and myriad other topics, he has yet to share publicly any acknowledgement of his own criminal conduct on April 12, 2014.

### c.   The Need for the Sentence to Promote Respect for the Law and to Afford Adequate Deterrence and Just Punishment.

The recommended sentence will promote respect for the law and afford an adequate deterrence to others.  Engel was very public in flaunting his disrespect for the law and has long affiliated with the so-called Militia and Patriot Movements, which ascribe to the belief that the federal government is an enemy of the constitution that must be dealt with by force.  Engel has confirmed this belief system by his actions and words.

General deterrence is one of the prescribed goals of every sentencing.  18 U.S.C. § 3553(a)(2)(B); *see also United States v. Onuoha*, 820 F.3d 1049, 1055 (9th Cir. 2016) (noting that the government has "an interest in gaining a trial conviction to show others that such conduct will result predictably in conviction and a serious penalty of incarceration"); *United States v. Dyer*, 216 F.3d 568, 570 (7th Cir. 2000) (noting one principal objective of criminal punishment is deterrence).  General deterrence is a significant factor in the present case.  Further, general deterrence depends upon the public seeing some consequence for criminal conduct - not only among potential wrongdoers who may be deterred from committing crimes, but also among law-abiding citizens who need assurance that the criminal justice system will do its utmost to protect law enforcement from harm.

Engel's convictions are grounded not only in violence and lawless acts, but also in his complete disregard for the rule of law.  Engel came to Bunkerville for the express purpose of engaging federal law enforcement officers and brought weapons and ammunition with him.

The inescapable corollary is that Engel will do it again – whether by himself and/or by inciting and encouraging others to act. His rhetoric and his conduct relating to these charges make clear that he has not changed his mind about the federal government, federal law enforcement authorities, or the law.   As demonstrated above, Engel has essentially declared a personal war against the federal government.  No evidence was adduced during this massive investigation, or during the lengthy trials, to suggest that Engel has changed his mind about any of his actions on April 12 or about his willingness to repeat them.

### d.   The Need to Avoid Unwarranted Sentencing Disparities

A sentence of at least 210 months is also necessary to avoid unwarranted sentencing disparities in this case.  Defendant Gerald Delemus, one of the initial defendants to plead guilty in this case, received an upward departure pursuant to 3A1.4 n. 4 and was sentenced to 87 months imprisonment.  Likewise, Defendant Gregory Burleson, who was convicted with Engel at trial, also received a n. 4 upward departure and was sentenced to 57 years of imprisonment.  Accordingly, Engel should be sentenced consistently with an upward departure under n. 4 and with a Guideline sentence of at least 210 months' imprisonment.

Finally, the sentence in this case should send a clear message that the Bundy Ranch standoff is a felony crime of violence, not a patriotic act that others should emulate.   Engel placed numerous law enforcement and federal officials' lives in jeopardy by his armed participation in the violent confrontation orchestrated by Bundy.   A lengthy guideline sentence of imprisonment will send the appropriate message that the Court will not tolerate individuals using violence to impede and thwart legitimate law enforcement activities and orders of the court.   Such sentence will also protect law enforcement officers from similar conduct by this defendant, conduct he has never renounced and continues to celebrate and embrace to this day.

## IV.   Conclusion

**WHEREFORE**, for all the foregoing reasons, the Court should impose a sentence of at least 210 months' imprisonment, adjust the sentence upward under Section§ 3A1.4, Commentary Note 4, enter an order of restitution for the value of the extorted property, and impose a term of three years' supervised release as to the counts of conviction (Counts 12 and 16) in this case.

**DATED** this 12th day of July, 2018.

Respectfully,

DAYLE ELIESON
United States Attorney

*/s/ Steven W. Myhre*

_____
STEVEN W. MYHRE
NADIA J. AHMED
DANIEL SCHIESS
Assistant United States Attorneys

*Attorneys for the United States*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I am an employee of the United States Attorney's Office.  A copy of the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was served upon counsel of record, via Electronic Case Filing (ECF).

**DATED** this 12th day of July, 2018.

*/s/ Steven W. Myhre*
_____
STEVEN W. MYHRE
Acting United State Attorney

21